# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

TONY TOLBERT, MICHAEL
GRAVES, LYNN HANSEN, ROCKY
HOLT, JONATHAN BROWN, and
JEFFREY LOPEZ,

           Plaintiffs,

v.

THE SALVATION ARMY, a Georgia
Corporation,

           Defendants.

Civil Action No.:

## COMPLAINT

Plaintiffs performed strenuous work in The Salvation Army's commercial thrift store operations for periods of weeks or months for less than a dollar per hour. *See* Exhibit A.  The Salvation Army has no excuse for not paying Plaintiffs; no exception to the minimum or overtime wage requirements of the federal Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* applies. Accordingly, Plaintiffs Tony Tolbert, Michael Graves, Lynn Hansen, Rocky Holt, Jonathan Brown, and Jeffrey Lopez ("Plaintiffs"), by and through their attorneys, Nichols Kaster, PLLP, Justice Catalyst

1

Law, and Austin & Sparks, P.C., bring this Complaint against The Salvation Army, a Georgia Corporation ("SA Southern Territory"), and allege as follows:

## Introduction

1.     The Salvation Army operates over 100 Adult Rehabilitation Centers ("ARCs") throughout the United States, including in Georgia, South Carolina, and Texas. Defendant SA Southern Territory operates the ARCs in these and other states in the Southern and Southeastern United States.

2.     The fundamental tenant of the ARC program (the "Adult Rehabilitation Program(s)" or "ARC Program(s)"), regardless of location, is the same: if you do not work, you may not stay.

3.     The Salvation Army's Adult Rehabilitation Program is purportedly meant to treat drug or alcohol use disorders. Many individuals are "justice-referred" – these individuals, generally with substance use disorders, are court- or probation-ordered to report to and participate in the ARC Program as a probation condition and/or alternative to incarceration. There are also walk-in participants, who often turn to The Salvation Army because they have nowhere else to go.

4.     SA Southern Territory requires individuals in ARC Programs to work forty hours or more per week in physically demanding jobs in exchange for a "gratuity" of between approximately $5 and $21 per week. The Salvation Army calls

2

ARC Program participants' labor "work therapy," but it is indistinguishable from *work*, including work performed by other paid employees.

5.      The work that ARC Program participants perform is generally related to The Salvation Army's commercial thrift store operations: The Salvation Army accepts donations from the public of clothing and goods and resells them for a profit either on the global wholesale market or in local secondhand shops called "Salvation Army Family Stores," "Salvation Army Family Thrift Stores," or "Salvation Army Thrift Stores."

6.      ARC Program participants are not incarcerated and there is no legal basis for SA Southern Territory to suffer or permit them to work without minimum wage or overtime pay.

7.      What is more, SA Southern Territory imposes a quota for some ARC Program work assignments and if the worker does not meet their quota, SA Southern Territory reduces their "gratuity" to correspond to the reduced output.

8.      When an ARC Program participant cannot work at all, SA Southern Territory does not merely withhold their meager "gratuity" – SA Southern Territory removes participants who cannot work from the program altogether, thus depriving them of the promised food, shelter, and clothing that brought many individuals to The Salvation Army in the first place.

3

9.      SA Southern Territory directly benefits from participants' work, which includes: loading and unloading furniture and other donations; sorting and hanging clothing; repairing broken donations and preparing them for sale; hauling armoires, refrigerators, washing machines, and other large furniture and home appliances; selling merchandise to customers and loadings purchases into their private vehicles; cleaning, organizing, and maintaining thrift stores and ARCs; and preparing meals for ARC Program participants and SA Southern Territory employees.  Participants' work is integral to thrift store operations, and SA Southern Territory's ability to sell thrift store merchandise is directly correlated with participants' labor. SA Southern Territory also benefits economically from the work it requires program participants to do outside of the thrift store operations, like upkeep and kitchen work at ARC Program sites.

10.      ARC Program participants' labor allows SA Southern Territory to avoid paying market-rate for the same work. Each year, The Salvation Army generates hundreds of millions of dollars in revenue from its U.S. thrift store operations, including in the Southern Territory.

11.      Through its unlawful acts, SA Southern Territory violates the overtime, minimum wage, and anti-retaliation provisions of the Fair Labor Standards Act, as outlined in detail below.

4

## JURISDICTION AND VENUE

12.     This Court has original jurisdiction to hear this Complaint and to adjudicate the claims stated herein pursuant to 28 U.S.C. § 1331 because this action asserts claims arising under federal law, the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*

13.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant resides in this District and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

14.     Defendant SA Southern Territory is incorporated in Georgia, headquartered in Atlanta, Georgia, and operates throughout the southern United States.

15.     At all times relevant to this action, SA Southern Territory qualifies as Plaintiffs' "employer" engaged in interstate commerce and/or the production of goods for commerce within the meaning of the FLSA, 29 U.S.C. §§ 203(d), (g).

16.     At all relevant times, SA Southern Territory's gross annual sales made or business done has been in excess of $500,000.

17.     Plaintiffs were each enrolled in ARC Programs operated by Defendant and required to perform work (hereinafter, "Rehabilitation Program Employee(s)").

18.     Plaintiff Tony Tolbert is an adult resident of South Carolina. Plaintiff Tolbert worked for SA Southern Territory from approximately September 2020 until March 2021 as a Rehabilitation Program Employee at a Salvation Army thrift store in Taylors, South Carolina and a Salvation Army ARC kitchen in Greenville, South Carolina. Plaintiff Tolbert qualified as an employee of SA Southern Territory under the FLSA, 29 U.S.C. § 203(e)(1).

19.     Plaintiff Michael Graves is an adult resident of South Carolina. Plaintiff Graves worked for SA Southern Territory from approximately July 2021 until August 2021 as a Rehabilitation Program Employee at a Salvation Army thrift store warehouse in Greenville, South Carolina. Plaintiff Graves qualified as an employee of SA Southern Territory under the FLSA, 29 U.S.C. § 203(e)(1).

20.     Plaintiff Lynn Hansen is an adult resident of South Carolina. Plaintiff Hansen worked for SA Southern Territory from approximately November 2020 to June 2021 as a Rehabilitation Program Employee at a Salvation Army thrift store warehouse and performing kitchen and maintenance work in a Salvation Army ARC in Greenville, South Carolina. Plaintiff Hansen qualified as an employee of SA Southern Territory under the FLSA, 29 U.S.C. § 203(e)(1).

21.     Plaintiff Rocky Holt is an adult resident of South Carolina.  Plaintiff Holt  worked  for  SA  Southern  Territory  from  approximately  June  2019  until

sometime in November 2019, as a Rehabilitation Program Employee in a Salvation Army thrift store warehouse and a Salvation Army thrift store in Greenville, South Carolina. Plaintiff Holt qualified as an employee of SA Southern Territory under the FLSA, 29 U.S.C. § 203(e)(1).

22.    Plaintiff Jonathan Brown is an adult resident of Texas. Plaintiff Brown worked for SA Southern Territory from approximately June 2019 until sometime in November 2019 as a Rehabilitation Program Employee in a Salvation Army thrift store warehouse in Fort Worth, Texas. Plaintiff Brown qualified as an employee of SA Southern Territory under the FLSA, 29 U.S.C. § 203(e)(1).

23.    Plaintiff Jeffrey Lopez is an adult resident of Texas. Plaintiff Lopez worked for SA Southern Territory from approximately September 2019 until February 2020 as a Rehabilitation Program Employee in a Salvation Army thrift store warehouse in Fort Worth, Texas. Plaintiff Lopez qualified as an employee of SA Southern Territory under the FLSA, 29 U.S.C. § 203(e)(1).

24.    Plaintiffs have consented in writing to assert claims for unpaid minimum wages and overtimes under the FLSA, 29 U.S.C. § 216(b). (*See* <u>Ex. A</u>.)

## FACTUAL ALLEGATIONS

25.    Plaintiffs re-allege and incorporate by reference the above paragraphs as if fully set forth herein.

## The Salvation Army's Organizational Structure

26.     The Salvation Army in the United States is divided into four territories: Eastern, Central, Southern, and Western. Each territory has its own Territorial Commander, who serves as the leader of the territory. Above the Territorial Commanders sits the National Commander, the leader of The Salvation Army in the United States.

27.     Defendant operates within the Southern Territory, which consists of the following 15 states: Alabama, Arkansas, Florida, Georgia, Kentucky, Louisiana, Maryland, Mississippi, North Carolina, Oklahoma, South Carolina, Tennessee, Texas, Virginia, Washington, D.C., and West Virginia.

## Defendant's Common Employment Practices at Adult Rehabilitation Centers

28.     Defendant owns, leases, leases to, or operates ARCs throughout the Southern Territory, including in Atlanta, Georgia; Greenville, South Carolina; and Forth Worth, Texas.

29.     Defendant owns, leases, leases to, or operates thrift stores throughout the Southern Territory, including in Atlanta, Georgia; Greenville, South Carolina; and Forth Worth, Texas.

30.     Defendant's ARCs operate in conjunction with its thrift stores.

8

31.    Defendant staffs its thrift store operations, in part, with Rehabilitation Program Employees.

32.    Defendant requires Rehabilitation Program Employees perform this work for little or no pay, under the guise of "work therapy."

33.    Defendant's "work therapy" program requires that Rehabilitation Program Employees work at least eight hours per day, and at least 40 hours per week.

34.    Defendant controls all elements of the job performed by the participants, including, but not limited to the start time, the end time, the break times, the meal times, the mode of transportation to the work location, the work location, the work assignment, the tools used to perform the work, whether the work is performed sitting or standing, and the pace at which participants are required to work.

35.    Defendant even imposes productivity quotas on Rehabilitation Program Employees.

36.    Rehabilitation Program Employees perform strenuous work for SA Southern Territory, including in its warehouses, stock rooms, kitchens, thrift stores, and on its donation collection trucks.

37.    Rehabilitation Program Employees perform this work regardless of their health status.

9

38.     Many workers arrive at the ARC in the early stages of recovery from substance use disorders and are required to work while experiencing painful withdrawal symptoms, without access to medication, and without supervision from medical professionals.

39.     Participants who are too sick to work are forced to leave the ARC – if you do not work, you may not stay.

40.     Defendant does not consider Rehabilitation Program Employees to be employees and does not include these workers on its payroll.

41.     The tasks Rehabilitation Program Employees perform are critical functions that would otherwise need to be performed by employees on Defendant's payroll.

42.     Defendant's work therapy program requires that Rehabilitation Program Employees work eight-hour days and 40 hours a week, but often resulted in Rehabilitation Program Employees working more than 40 hours in a week.

43.     A core premise of Defendant's "work therapy" program is that participants must work a full-time schedule without payment of market rate wages.

44.     Instead of paying regular wages to Rehabilitation Program Employees, Defendant provides for payment of small weekly "gratuities" in exchange for the long hours of work performed.

10

45.    The "gratuity" ranges from approximately $5 per week to $21 per week.

46.    Defendant pays these gratuities in cash and SA Southern Territory employees handle the transactions.

47.    When Rehabilitation Program Employees do not meet their productivity quotas, or question the payment policies and working conditions, Defendant reduces the Rehabilitation Program Employee's weekly gratuity or withholds it entirely.

48.    Defendant also has employees who are *not* part of the Adult Rehabilitation Program who work side-by-side with Rehabilitation Program Employees.

49.    Defendant pays these other employees market-rate wages that meet or exceed federal minimum wage requirements.

50.    In addition to requiring long hours of work for little pay, Defendant sometimes requires that Rehabilitation Program Employees turn over their Supplemental Nutritional Assistance Program (SNAP) and social security disability benefits (often several hundred dollars per month) to SA Southern Territory to be spent at SA Southern Territory's discretion.

## **Plaintiffs' Work in Defendant's Rehabilitation Program**

### *Tony Tolbert*

51.    Plaintiff Tolbert ("Tolbert") started as a walk-in participant at the Greenville, South Carolina ARC in September 2020. He remained there until March 2021.

52.    Tolbert was told he had to work to stay at the ARC.

53.    He was only allowed to work for SA Southern Territory and was required to live on site.

54.    Tolbert worked at least 40 hours per week in exchange for a weekly "gratuity."

55.    He received five dollars each week in the beginning and received twenty dollars per week by the time he completed the program.

56.    Tolbert received his weekly gratuity, in cash, from an SA Southern Territory employee.

57.    SA Southern Territory employees, including former Lieutenant, now Captain, Kyle Madison ("Captain Madison" or "Madison"), kept records of how many hours Tolbert worked and how much money he was given in return.

58.    Tolbert was not given paystubs reflecting his hours worked or pay.

59.     Tolbert regularly worked over 40 hours per week. By way of example, the week of Thanksgiving 2020, Tolbert worked approximately 45 hours in exchange for ten dollars. That week SA Southern Territory paid Tolbert less than $0.23 an hour for his labor.

<u>SA Southern Territory Requires Tolbert to Perform Crucial Labor in a Salvation Army Thrift Store Alongside Fully-Paid Employees</u>

60.     Tolbert worked in a Salvation Army thrift store in Taylors, South Carolina.

61.     The thrift store was operated by SA Southern Territory.

62.     Each morning an SA Southern Territory employee drove Tolbert to Taylors from Greenville in a van emblazoned with The Salvation Army logo.

63.     Depending on traffic, the ride was half an hour to an hour each way. Each evening, the same van returned Tolbert to the Greenville ARC.

64.     Tolbert rode in a van for up to an hour, performed at least eight hours of manual labor, waited for the van to come pick him up, and then rode up to another hour back to the ARC. Some days Tolbert missed meals because of how long it took to get back from his work assignment in Taylors.

65.     SA Southern Territory employees, including Madison, decided that Tolbert must work in Taylors instead of the Salvation Army thrift store in Greenville.

66.    Tolbert had no say in his work assignment and was required to live at the ARC in Greenville.

67.    Tolbert performed many different jobs at the Salvation Army thrift store. He loaded and unloaded trucks, sorted donations, cleaned bathrooms and mopped floors, stocked shelves, hung clothing in the front of the store, interacted with customers, loaded purchases into customers' cars, and did anything else SA Southern Territory's paid employees told him to do.

68.    SA Southern Territory depended on the donations Tolbert unloaded from trucks and sorted in the back of the store. The thrift store would not have merchandise to sell to customers without the donations Tolbert collected. Had Tolbert and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

69.    Tolbert also worked with fully-paid employees in the front of the thrift store. He cleaned, stocked shelves, and hung clothing alongside fully-paid employees. Tolbert even interacted with customers and loaded their thrift store purchases into their cars, just the same as fully-paid employees.

70.    The thrift store depended on Tolbert's labor. Had Tolbert not been performing that work, SA Southern Territory would be forced to hire another fully-paid employee to do it.

14

71.    SA Southern Territory provided any tools Tolbert needed to complete his work.

72.    SA Southern Territory employees, including Melanie Taylor ("Taylor"), the thrift store manager, supervised Tolbert at the thrift store.

73.    SA Southern Territory employees dictated Tolbert's work schedule and location.

74.    Taylor, and other SA Southern Territory employees, had the power to change Tolbert's work assignment and to send him to a different location in an entirely different city.

75.    Tolbert, conversely, did not have the ability to modify the terms of his employment.

76.    Fully-paid SA Southern Territory employees, including Taylor, told Tolbert where to go, what to do, and how to do it.

77.    SA Southern Territory employees even dictated what Tolbert could and could not say. They told Tolbert what to say to customers, and more importantly, what not to say.

78.    Tolbert was strictly forbidden from speaking negatively about The Salvation Army. He understood that criticizing "The Sally" led to consequences.

15

79.     Taylor, and other SA Southern Territory employees, also set productivity quotas for Tolbert.

80.     For example, SA Southern Territory employees required Tolbert to pull and sort a specific amount of donated clothing, hang it on a specific number of racks, and take those racks to the sales floor inside the thrift store all within a specific and limited amount of time.

81.     On several occasions, SA Southern Territory employees required Tolbert to load a certain number of clothing bins in thirty minutes or less.

82.     The donations Tolbert hung and loaded to make quota were then sold as merchandise in the thrift store.

83.     If Tolbert failed to make his quota, Taylor, or another SA Southern Territory employee, would call Madison to report Tolbert's failure.

84.     Madison, and one of the SA Southern Territory employees who drove Tolbert to the thrift store, would come to the store to reprimand Rehabilitation Program Employees who failed to make quota.

85.     Madison belittled and degraded Rehabilitation Program Employees who failed to perform essential thrift store operations quickly enough. Afterall, the thrift store could not sell donations as merchandise if Tolbert and others failed to promptly sort and prepare those items.

16

86.    Madison, and other SA Southern Territory employees, threatened to take Rehabilitation Program Employees' gratuities for poor performance, including failing to make quotas.

87.    Tolbert understood that if he failed to make the quotas SA Southern Territory employees set for him at the thrift store, SA Southern Territory employees would refuse to pay him his gratuity.

88.    Tolbert understood that his gratuity was contingent on his labor in the Salvation Army thrift store.

<u>SA Southern Territory Re-Assigns Tolbert to Cook Meals for the Entire Adult Rehabilitation Program</u>

89.    Tolbert also worked in the kitchen at the ARC.

90.    The ARC kitchen was leased, owned, or operated by SA Southern Territory.

91.    Madison re-assigned Tolbert to work in the ARC kitchen for his final two weeks in the ARC.

92.    Tolbert had no control over the change in assignment.

93.    Tolbert cooked for ARC participants and SA Southern Territory employees.

94.    Tolbert worked alongside fully-paid SA Southern Territory employees in the kitchen.

17

95. SA Southern Territory depended on the work Tolbert did in the kitchen. Had Tolbert and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire additional fully-paid employees to do it.

96. SA Southern Territory provided any tools Tolbert needed to complete his work.

97. This included utensils, pots and pans, and the ingredients Tolbert cooked with.

98. Tolbert did not supply any of his own tools or ingredients.

99. Tolbert was supervised by SA Southern Territory employees.

100. SA Southern Territory employees dictated what Tolbert did and when. They told him what food to cook, how much to cook, how to cook it, and how quickly to do it.

101. SA Southern Territory employees also dictated Tolbert's work schedule.

102. Tolbert understood that his gratuity was contingent on his labor in the ARC kitchen.

18

***Michael Graves***

103.   Plaintiff Graves ("Graves") started as a walk-in participant at the Greenville, South Carolina ARC in early July 2021. He remained there until late August 2021.

104.   For the first thirty days he was at the ARC, Graves was only allowed to leave the building to go to work.

105.   He was not allowed to use the telephone.

106.   Graves was told he had to work to stay at the ARC.

107.   He was only allowed to work for SA Southern Territory and was required to live on site.

108.   Graves worked at least 40 hours per week in exchange for a weekly "gratuity."

109.   He received five dollars each week in the beginning and up to ten dollars each week by the time he left the program.

110.   Graves regularly worked over 40 hours per week. By way of example, the week of July 12, 2021, Graves worked approximately 48 hours in exchange for five dollars. That week SA Southern Territory paid Graves less than $0.11 an hour for his labor.

<u>SA Southern Territory Requires Graves to Unload Donations to Sell as
Merchandise in a Salvation Army Thrift Store</u>

111.   Graves worked in a Salvation Army warehouse attached to a Salvation Army thrift store in Greenville, South Carolina.

112.   Both were operated by SA Southern Territory.

113.   Graves worked on the warehouse dock, loading and unloading trucks filled with donations for the thrift store.

114.   The trucks Graves loaded and unloaded were operated by SA Southern Territory employees.

115.   SA Southern Territory depended on the donations Graves unloaded. The thrift store would not have merchandise to sell without the donations Graves collected. Had Graves and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

116.   SA Southern Territory provided any tools Graves needed to complete his work.

117.   Graves was supervised by SA Southern Territory employees, including the manager of the attached Salvation Army thrift store.

118.   SA Southern Territory employees dictated what Graves did and when. They told him which trucks to unload, where to put the merchandise, and how quickly to complete his tasks.

119.   SA Southern Territory employees even dictated when Graves could sit down, take a break, or eat lunch.

120.   If Graves interacted with a thrift store customer, sat down when he was told to stand, or did not do exactly as directed, SA Southern Territory Employees would punish and threaten him.

121.   SA Southern Territory Employees would punish Graves by making him forfeit one of the two ten-minute breaks he received each day.

122.   SA Southern Territory Employees also threatened to call Captain Madison and take away Graves' gratuity for that week.

123.   Graves understood that his gratuity was contingent on his labor in the Salvation Army thrift store warehouse.

SA Southern Territory Employees Retaliate When Graves Questions Pay Practices

124.   In late August 2021, Graves heard about a lawsuit against The Salvation Army in California brought by ARC Program participants. That lawsuit alleged wage and hour violations. Graves discussed the lawsuit with other ARC Program participants, who encouraged him to confront SA Southern Territory about failing

21

to pay ARC participants – including himself and his colleagues at the SA Southern Territory ARC – wages for their work.

125.   Shortly thereafter, Graves confronted a Salvation Army thrift store employee while at work and asked them why SA Southern Territory was not paying them the wages they are owed.

126.   In response to Graves' confrontation, the employee contacted Captain Madison.

127.   Madison arrived at the thrift store approximately thirty minutes later.

128.   Graves confronted Madison when he arrived and again asked why SA Southern Territory was not paying ARC Program participants wages for their work.

129.   Madison immediately informed Graves that he could no longer participate in the ARC program and had Graves escorted from the building.

130.   While Graves was waiting outside of the ARC after being removed, SA Southern Territory Employees called the police to report him for trespassing and to have him removed from the sidewalk outside the property.

**Lynn Hansen**

131.   Plaintiff Hansen ("Hansen") started at the Greenville, South Carolina ARC in November 2020. He remained there until June 2021.

132.   Hansen was sent to the ARC as part of a court diversion program.

133.   Hansen was not incarcerated while he was an employee of SA Southern Territory.

134.   Hansen was told he had to work to stay at the ARC.

135.   He was only allowed to work for SA Southern Territory and was required to live on site.

136.   Hansen worked at least 40 hours per week in exchange for a weekly "gratuity."

137.   He received ten dollars each week for the first 90 days, then fifteen dollars each week for the next 60 days, and twenty dollars each week for the last 30 days.

138.   Hansen regularly worked over 40 hours per week. By way of example, on the week of May 31, 2021, Hansen worked approximately 80 hours in exchange for fifteen dollars. That week SA Southern Territory paid Hansen less than $0.19 an hour for his labor.

139.   Hansen worked in several positions at the ARC, including in the thrift store and warehouse, kitchen, and dorm.

<u>SA Southern Territory Required Hansen to Unloaded Donations to Sell as Merchandise in a Salvation Army Thrift Store</u>

140.   Hansen worked in a Salvation Army warehouse attached to a Salvation Army thrift store in Greenville, South Carolina.

23

141.   Both were operated by SA Southern Territory.

142.   Hansen worked on the warehouse dock, loading and unloading trucks filled with donations for the thrift store.

143.   The trucks Hansen loaded and unloaded were operated by SA Southern Territory employees.

144.   Hansen also assembled furniture and carried it out to private vehicles for thrift store customers.

145.   SA Southern Territory employees also instructed Hansen to sort the donations that were unloaded from the trucks and prepare the items to be sold as merchandise in the thrift store. This included hanging clothes on hangers and placing the hangers on racks which were then taken out onto the sales floor in the thrift store.

146.   SA Southern Territory depended on the donations Hansen unloaded, sorted, prepared, and racked. The thrift store would not have merchandise to sell to customers without the donations Hansen collected. Had Hansen and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

147.   SA Southern Territory provided any tools Hansen needed to complete his work.

148.   Hansen was supervised by SA Southern Territory employees.

24

149.   SA Southern Territory employees dictated what Hansen did and when. They told him which trucks to unload, where to put the merchandise, which donations to sort, how to sort the donations, which clothes to hang, and how quickly to complete his tasks.

150.   SA Southern Territory employees also dictated Hansen's schedule, including any lunch or other breaks.

151.   Hansen saw other participants lose their gratuities after not working as hard, long, or fast as SA Southern Territory employees demanded.

152.   Hansen understood that his gratuity was contingent on his labor in the Salvation Army thrift store warehouse.

### SA Southern Territory Requires Hansen to Clean and Maintain SA Southern Territory Facilities

153.   Hansen also worked in the ARC kitchen and as an ARC "Houseman." He kept the ARC dorms, restrooms, halls, and living area clean.

154.   The ARC kitchen, dorms, restrooms, halls, and living area were leased, owned, or operated by SA Southern Territory.

155.   Had Hansen and other Rehabilitation Program Employees not been performing that kitchen and janitorial work, SA Southern Territory would be forced to hire fully-paid employees to do it.

25

156.   SA Southern Territory provided any tools Hansen needed to complete his work, including cooking and cleaning supplies.

157.   Hansen was supervised by SA Southern Territory employees.

158.   SA Southern Territory employees dictated what Hansen did and when. They told him what food to cook, how much to cook, how to cook it, and how quickly to do it. They also told him what to clean, how to clean it, and how quickly to do it.

159.   Hansen saw other participants lose their gratuities after not working as hard, long, or fast as SA Southern Territory employees demanded.

160.   Hansen understood that his gratuity was contingent on his labor in the SA Southern Territory ARC kitchen and facilities.

***Rocky Holt***

161.   Plaintiff Holt ("Holt") started at the Greenville, South Carolina ARC in June 2019. He remained there until sometime in November 2019.

162.   Holt was sent to the ARC as part of the conditions of his probation.

163.   Holt was not incarcerated while he was an employee of SA Southern Territory.

164.   Holt was told he had to work to stay at the ARC.

165.   He was only allowed to work for SA Southern Territory and was required to live on site.

166.   Holt worked at least 40 hours per week in exchange for a weekly "gratuity."

167.   He received fifteen dollars each week.

168.   Holt regularly worked over 40 hours per week. By way of example, on the week of July 13, 2019, Holt worked approximately 48 hours in exchange for fifteen dollars. That week SA Southern Territory paid Holt less than $0.32 an hour for his labor.

<u>SA Southern Territory Requires Holt to Fix Donated Electronics for SA Southern Territory to Sell as Merchandise</u>

169.   Holt worked in a Salvation Army warehouse attached to a Salvation Army thrift store in Greenville, South Carolina. He also worked in the Salvation Army thrift store itself.

170.   Both were operated by SA Southern Territory.

171.   Holt worked in the warehouse repairing donated electronics so that they could be sold in the thrift store.

172.   The electronics Holt worked with were unloaded from trucks operated by SA Southern Territory employees.

173.   SA Southern Territory employees instructed Holt to fix the donated electronics and prepare them to be sold in the thrift store.

174.   SA Southern Territory depended on the donations Holt fixed, sorted, and prepared. The thrift store would not have merchandise without the donations Holt prepared for sale. Had Holt and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

175.   SA Southern Territory provided any tools Holt needed to complete his work, including tools for repairing electronics.

176.   Holt was supervised by SA Southern Territory employees.

177.   SA Southern Territory employees dictated what Holt did and when. They told him which electronics to fix, what tools to use, and how quickly to do it.

178.   SA Southern Territory employees also dictated Holt's schedule, including any lunch or other breaks.

179.   Holt worked alongside fully-paid SA Southern Territory employees in the warehouse.

180.   Holt understood that his gratuity was contingent on his labor in the Salvation Army warehouse.

<u>SA Southern Territory Requires Holt to Organize and Maintain Merchandise in a
Salvation Army Thrift Store</u>

181.   Holt also worked in the Salvation Army thrift store, organizing the
books that were out on the shelves waiting to be sold.

182.   The books Holt organized were unloaded from trucks operated by SA
Southern Territory employees.

183.   They were also sorted, prepared for sale, and brought into the thrift
store by SA Southern Territory employees.

184.   SA Southern Territory employees instructed Holt to organize the books
in the thrift store, including shifting them around on shelves, reordering, and tidying
the displays.

185.   Had Holt and other Rehabilitation Program Employees not been
performing that work, SA Southern Territory would be forced to hire fully-paid
employees to do it.

186.   SA Southern Territory provided any tools Holt needed to complete his
work.

187.   Holt was supervised by SA Southern Territory employees, including
the staff working in the front of the thrift store.

188.   SA Southern Territory employees dictated how Holt organized the books. They told him which books to organize, on which shelves, in what order, and how quickly to do it.

189.   SA Southern Territory employees also dictated Holt's schedule, including any lunch or other breaks.

190.   Holt worked alongside fully-paid SA Southern Territory employees in the thrift store.

191.   Holt understood that his gratuity was contingent on his labor in the Salvation Army thrift store.

**Jonathan Brown**

192.   Plaintiff Brown ("Brown") started at the Fort Worth, Texas ARC in June 2019. He remained there until sometime in November 2019.

193.   Brown was sent to the ARC as a condition of his probation.

194.   Brown was not incarcerated while he was an employee of SA Southern Territory.

195.   SA Southern Territory employees isolated Brown from the outside world.

196.   Brown was not allowed to leave the building for the first thirty days he was at the ARC.

197.   Further, Brown was not allowed to make phone calls for the first thirty days he was at the ARC.

198.   SA Southern Territory employees enforced that rule by confiscating Rehabilitation Program Employees' cell phones.

199.   SA Southern Territory required Brown to sign up for SNAP benefits when he arrived at the ARC.

200.   SA Southern Territory then used the SNAP benefits it required Brown to apply for at its own discretion.

201.   Brown does not remember ever even seeing his SNAP benefits card while he was at the ARC.

202.   Brown was told he had to work to stay at the ARC.

203.   He was only allowed to work for SA Southern Territory and was required to live on site.

204.   Brown worked at least 40 hours per week in exchange for a weekly "gratuity."

205.   He received seven dollars each week to start and then received an additional dollar each week. The maximum amount he could receive was twenty-one dollars each week.

206.   Each week, Brown lined up outside the ARC Residence Manager's office to receive his gratuity.

207.   The ARC Residence Manager was an SA Southern Territory employee.

208.   The ARC Residence Manager's office was inside the residential portion of a multi-use building that housed the ARC, a Salvation Army thrift store warehouse, and a Salvation Army thrift store.

209.   The ARC, the warehouse, and the thrift store were all operated by SA Southern Territory.

210.   SA Southern Territory employees handed Brown his gratuity in cash.

211.   SA Southern Territory employees required Brown to sign his name next to the amount of cash he was given as a gratuity that week.

212.   SA Southern Territory employees kept Brown's records, and those of other Rehabilitation Program Employees, in a ledger.

213.   The ledger was controlled by SA Southern Territory employees, including the Residence Manager.

214.   Brown was not given paystubs reflecting his hours worked or pay.

215.   Brown regularly worked over 40 hours per week. By way of example, on the week of November 1, 2019, Brown worked approximately 50 hours in

exchange for nineteen dollars. That week SA Southern Territory paid Brown $0.38 per hour for his labor.

### SA Southern Territory Requires Brown to Unload Donations to Sell as Merchandise in a Salvation Army Thrift Store

216. Brown worked in a Salvation Army warehouse attached to the ARC in Fort Worth, Texas.

217. The ARC and warehouse were directly attached to a Salvation Army thrift store.

218. The ARC, the warehouse, and the thrift store were all operated by SA Southern Territory.

219. Brown worked on the warehouse dock, loading and unloading trucks filled with donations for the SA Southern Territory thrift stores.

220. Many of the trucks Brown loaded and unloaded were operated by SA Southern Territory employees.

221. Sometimes Brown unloaded thrift store donations from private vehicles. Those donations were then sold as merchandise in the thrift store.

222. Brown also loaded customers' thrift store purchases into their private vehicles.

223. At the direction of SA Southern Territory employees, Brown carried heavy furniture and household appliances off the trucks and into the warehouse to

prepare for sale in the thrift store. This included hauling heavy armoires, sofa sleepers, and even refrigerators.

224.   SA Southern Territory depended on the donations Brown unloaded from the trucks and hauled into the warehouse. The thrift store would not have merchandise without the donations Brown collected. Had Brown and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

225.   SA Southern Territory provided any tools Brown needed to complete his work.

226.   Brown was supervised by SA Southern Territory employees, including, at times, SA Southern Territory Majors and Captains from other Salvation Army locations, including Arlington, Texas.

227.   SA Southern Territory employees dictated what Brown did and when. They told him which trucks to unload, where to put the merchandise, and how quickly to complete his tasks.

228.   SA Southern Territory employees also dictated Brown's schedule, including requiring him to sign in when he entered the warehouse at 7:00 a.m. each day.

### SA Southern Territory Sets a Quota for Hanging Donated Clothing on Racks to Sell as Merchandise in Salvation Army Thrift Stores

229.   Brown also worked in the Salvation Army warehouse sorting room preparing donated items to become merchandise in the Salvation Army thrift store.

230.   The merchandise Brown prepared was unloaded, in part, from trucks operated by SA Southern Territory employees.

231.   At the direction of SA Southern Territory employees, Brown hung donated clothing on hangers and racks. The racked clothing would then be sold as merchandise in the Salvation Army thrift store.

232.   SA Southern Territory depended on the donations Brown hung on hangers and racks. The thrift store would not have merchandise to sell to customers without the donations Brown prepared. Had Brown and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

233.   SA Southern Territory provided any tools Brown needed to complete his work.

234.   Brown was supervised by SA Southern Territory employees, including, at times, SA Southern Territory Majors and Captains from other Salvation Army locations, including Arlington, Texas.

35

235.  SA Southern Territory employees dictated what Brown did and when. They told him which clothes to hang and rack, which hangers to use, which racks to use, and how quickly to complete his tasks.

236.  SA Southern Territory employees told Brown that he had to meet a quota when he worked in the warehouse sorting room.

237.  SA Southern Territory employees dictated Brown's quota. They decided how many racks Brown needed to fill with clothing and how long he had to do it.

238.  SA Southern Territory employees decided not only how many racks Brown had to complete, but also what types of clothes Brown was allowed to hang and rack to meet his quota.

239.  SA Southern Territory employees could make it harder to meet his quota by requiring Brown to hang only a certain type of cumbersome and time-consuming clothing, or a type that was donated less frequently.

240.  Conversely, SA Southern Territory employees could make it easier to meet his quota by allowing Brown to hang simpler and more abundant types of clothing.

241.  SA Southern Territory employees exercised control over Brown's quota and his ability to meet the quota by deciding what to order him to do.

242.   SA Southern Territory employees tracked whether Brown met his quota.

243.   SA Southern Territory employees told Brown that he was not doing his job when he failed to meet his quota.

244.   Brown understood that his gratuity was contingent on his labor in the Salvation Army warehouse, and on following SA Southern Territory's policies, protocols, and expectations while working.

### Jeffrey Lopez

245.   Plaintiff Lopez ("Lopez") started as a walk-in participant at the Fort Worth, Texas ARC in September 2019. He remained there until February 2020.

246.   SA Southern Territory employees isolated Lopez from the outside world.

247.   Lopez was not allowed to leave the building for the first thirty days he was at the ARC.

248.   Further, Lopez was not allowed to make phone calls for the first thirty days he was at the ARC.

249.   SA Southern Territory employees enforced that rule by confiscating Rehabilitation Program Employees' cell phones.

250.   SA Southern Territory required Lopez to sign up for SNAP benefits when he arrived at the ARC.

251.   SA Southern Territory then used the SNAP benefits it required Lopez to apply for at its own discretion.

252.   Lopez does not remember ever even seeing his SNAP benefits card while he was at the ARC.

253.   In fact, Lopez does not remember ever seeing the SNAP benefits card at all. When Lopez spent 14 days in the hospital, away from the ARC, SA Southern Territory continued using the card to spend his SNAP benefits.

254.   When he returned from the hospital, SA Southern Territory employees turned Lopez away from the ARC for missing too many days of work and did not return his SNAP benefits card to him.

255.   Lopez was told he had to work to stay at the ARC.

256.   He was only allowed to work for SA Southern Territory and was required to live on site.

257.   Lopez worked at least 40 hours per week in exchange for a weekly "gratuity."

258.   He received seven dollars each week to start and then received an additional dollar each week. The maximum amount he could receive was twenty-one dollars each week.

259.   Each week, Lopez lined up outside the ARC Residence Manager's office to receive his gratuity.

260.   The ARC Residence Manager was an SA Southern Territory employee.

261.   The ARC Residence Manager's office was inside the residential portion of a multi-use building that housed the ARC, a Salvation Army thrift store warehouse, and a Salvation Army thrift store.

262.   The ARC, the warehouse, and the thrift store were all operated by SA Southern Territory.

263.   SA Southern Territory employees handed Lopez his gratuity in cash.

264.   SA Southern Territory employees required Lopez to sign his name next to the amount of cash he was given as a gratuity that week.

265.   SA Southern Territory employees kept Lopez's records, and those of other Rehabilitation Program Employees, in a ledger.

266.   The ledger was controlled by SA Southern Territory employees, including the ARC Residence Manager.

267.   Lopez was not given paystubs reflecting his hours worked or pay.

268.   Lopez regularly worked over 40 hours per week. By way of example, on his first week at the ARC, Lopez worked approximately 48 hours in exchange for seven dollars. That week SA Southern Territory paid Lopez less than $0.15 per hour for his labor.

### SA Southern Territory Requires Lopez to Unload Donations to Sell as Merchandise in a Salvation Army Thrift Store

269.   Lopez worked in a Salvation Army warehouse attached to the ARC in Fort Worth, Texas.

270.   The ARC and warehouse were directly attached to a Salvation Army thrift store.

271.   The ARC, the warehouse, and the thrift store were all operated by SA Southern Territory.

272.   Lopez worked on the warehouse dock, loading and unloading trucks filled with donations for the SA Southern Territory thrift stores.

273.   Many of the trucks Lopez loaded and unloaded were operated by SA Southern Territory employees.

274.   Sometimes Lopez unloaded thrift store donations from private vehicles. Those donations were then sold as merchandise in the thrift store.

275.   Lopez also loaded customers' thrift store purchases into their private vehicles.

40

276.   At the direction of SA Southern Territory employees, Lopez carried heavy furniture and household appliances off the trucks and into the warehouse to prepare for sale in the thrift store. This included hauling heavy washing machines and refrigerators.

277.   SA Southern Territory depended on the donations Lopez unloaded from the trucks and hauled into the warehouse. The thrift store would not have merchandise to sell to customers without the donations Lopez collected. Had Lopez and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

278.   SA Southern Territory provided any tools Lopez needed to complete his work.

279.   Lopez was supervised by SA Southern Territory employees, including, at times, SA Southern Territory Majors and Captains from other Salvation Army locations, including Arlington, Texas.

280.   On at least one occasion, an SA Southern Territory employee from corporate headquarters in Georgia came to observe, inspect, and supervise Lopez's work in the warehouse.

41

281. SA Southern Territory employees dictated what Lopez did and when. They told him which trucks to unload, where to put the merchandise, and how quickly to complete his tasks.

282. SA Southern Territory employees, including the warehouse supervisor and his foreman, also dictated Lopez's schedule, including requiring him to sign in when he entered the warehouse at 7:00 a.m. each day.

283. Lopez was not given paystubs reflecting his hours worked or pay.

284. Lopez understood that his gratuity was contingent on his labor in the Salvation Army warehouse.

### SA Southern Territory Sets a Quota for Hanging Donated Clothing on Racks to Sell as Merchandise in Salvation Army Thrift Stores

285. Lopez also worked in the Salvation Army warehouse sorting room preparing donated items to become merchandise in the Salvation Army thrift store.

286. The merchandise Lopez prepared was unloaded, in part, from trucks operated by SA Southern Territory employees.

287. At the direction of SA Southern Territory employees, Lopez boxed linens, put tags on clothing, and hung and racked clothing. The prepared donations would then be sold as merchandise in the Salvation Army thrift store.

288. SA Southern Territory depended on the donations Lopez prepared. The thrift store would not have merchandise without the donations Lopez prepared. Had

Lopez and other Rehabilitation Program Employees not been performing that work, SA Southern Territory would be forced to hire fully-paid employees to do it.

289.   SA Southern Territory provided any tools Lopez needed to complete his work.

290.   Lopez was supervised by SA Southern Territory employees.

291.   SA Southern Territory employees dictated what Lopez did and when. They told him which clothes to hang and rack, how to box linens, how to put tags on clothing, and how quickly to complete his tasks.

292.   SA Southern Territory employees told Lopez that he had to meet a quota when he worked in the warehouse sorting room.

293.   SA Southern Territory employees dictated Lopez's quota.

294.   They decided how many racks Lopez needed to fill with clothing and how long he had to do it.

295.   SA Southern Territory employees decided not only how many racks Lopez had to complete, but also what types of clothes Lopez was allowed to hang and rack to meet his quota.

296.   SA Southern Territory employees could make it harder to meet his quota by requiring Lopez to hang only a certain type of cumbersome and time-consuming clothing, or a type that was donated less frequently.

43

297.   Conversely, SA Southern Territory employees could make it easier to meet his quota by allowing Lopez to hang simpler and more abundant types of clothing.

298.   SA Southern Territory employees exercised control over Lopez's quota and his ability to meet the quota by deciding what to order him to do.

299.   SA Southern Territory employees tracked whether Lopez met his quota.

300.   SA Southern Territory employees told Lopez that he was not doing his job when he failed to meet his quota.

301.   SA Southern Territory employees could also unilaterally increase Lopez's quota, and did in anticipation of the inspection by an SA Southern Territory corporate employee from Georgia.

302.   Lopez witnessed SA Southern Territory employees reduce other Rehabilitation Program Employees' gratuities when they failed to meet their quotas.

303.   Lopez understood that his gratuity was contingent on his labor in the Salvation Army warehouse sorting room.

**<u>COUNT ONE</u>**
**Overtime Violations**
**Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.***
**(On Behalf of All Plaintiffs)**

304.   Plaintiffs restate and incorporate by reference the above paragraphs as if fully set forth herein.

44

305.   Plaintiffs assert this count pursuant to 29 U.S.C. § 216(b). Plaintiffs consent to join this action.

306.   The FLSA, 29 U.S.C. § 207, requires employers to pay all non-exempt employees one and one-half times the regular rate of pay for all hours worked over forty (40) per workweek.

307.   At all relevant times, Defendant had two or more employees.

308.   At all relevant times, Defendant had an annual dollar volume of sales or business done of at least $500,000.

309.   At all relevant times, Plaintiffs were engaged in commerce or in the production of goods for commerce.

310.   At all relevant times Defendant employed Plaintiffs, and Plaintiffs were Defendant's employees, within the meaning of 29 U.S.C § 203(d), 29 U.S.C § 203(e), and 29 U.S.C § 203(g).

311.   Plaintiffs are employees entitled to FLSA overtime compensation for all hours worked in excess of forty (40).

312.   Plaintiffs routinely worked in excess of forty (40) hours per week, but did not receive the appropriate overtime compensation from Defendants.

313.   By failing to pay overtime compensation, Defendant violated the FLSA.

45

314.   By failing to record, report, and/or preserve records of hours worked by Plaintiffs, Defendant failed to make, keep, and preserve records with respect to each of its employees sufficient to determine their wages, hours, and other conditions of employment, in violation of the FLSA, 29 U.S.C. § 255(a).

315.   The foregoing conduct, as alleged, constitutes a willful violation of the FLSA, within the meaning of 29 U.S.C. § 255(a).

316.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiffs have suffered and will continue to suffer a loss of income and other damages.  Plaintiffs are entitled to their unpaid overtime wages, liquidated damages, and attorneys' fees and costs incurred in connection with this claim.

## COUNT TWO
### Minimum Wage Violations
### Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.*
### (On Behalf of All Plaintiffs)

317.   Plaintiffs restate and incorporate by reference the above paragraphs as if fully set forth herein.

318.   Plaintiffs assert this count pursuant to 29 U.S.C. § 216(b). Plaintiffs consent to join this action.

319.   At all relevant times, Defendant had two or more employees.

320.   At all relevant times, Defendant had an annual dollar volume of sales or business done of at least $500,000.

321.   At all relevant times, Plaintiffs were engaged in commerce or in the production of goods for commerce.

322.   At all relevant times Defendant employed Plaintiffs, and Plaintiffs were Defendant's employees, within the meaning of 29 U.S.C § 203(d), 29 U.S.C § 203(e), and 29 U.S.C § 203(g).

323.   Defendant violated the FLSA when it failed to pay Plaintiffs at least minimum wage.

324.   Defendant's violations of the FLSA were willful under 29 U.S.C. § 255(a) because they knew or should have known that their pay practices violated the law.

325.   Plaintiffs are entitled to recover unpaid minimum wages, liquidated damages, attorneys' fees, costs, and post-judgment interest. 29 U.S.C. §§ 206, 216(b).

### COUNT THREE
**Retaliation**
**Fair Labor Standards Act, 29 U.S.C. § 201, *et seq.***
**(On Behalf of Plaintiff Graves)**

326.   Plaintiff Graves restates and incorporates by reference the above paragraphs as if fully set forth herein.

327.   Plaintiff Graves asserts this count pursuant to 29 U.S.C. § 216(b).

328.   At all relevant times, Defendant had two or more employees.

47

329.   At all relevant times, Defendant had an annual dollar volume of sales or business done of at least $500,000.

330.   At all relevant times, Plaintiff Graves was engaged in commerce or in the production of goods for commerce.

331.   At all relevant times, Defendant employed Plaintiff Graves, and Plaintiff Graves was Defendant's employee, within the meaning of 29 U.S.C § 203(d), 29 U.S.C § 203(e), and 29 U.S.C § 203(g).

332.   Section 215(a)(3) of the FLSA makes it unlawful for any person to "discharge or in any other manner discriminate against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to [the FLSA]."

333.   Plaintiff Graves engaged in protected activity within the meaning of the anti-retaliation provision of the FLSA by opposing Defendant's policy and practice of refusing to pay minimum or overtime wages and complaining to Defendant about Defendant's illegal conduct under the FLSA.

334.   Plaintiff Graves suffered adverse action upon engaging in this protected activity.

335.   Defendant retaliated against Plaintiff Graves in violation of the FLSA, 29 U.S.C. § 215(a)(3) as a result of his complaint.

48

336.   Defendant's violations of the FLSA were willful under 29 U.S.C. § 255, without a good faith or reasonable basis.

337.   As a direct and proximate result of Defendant's unlawful conduct, Plaintiff Graves suffered and will continue to suffer a loss of income, emotional distress, and other damages. Plaintiff Graves is entitled to all "such legal or equitable relief as may be appropriate to effectuate the purposes of section 215(a)(3)." He is also entitled to attorney's fees and costs under the FLSA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs Tolbert, Graves, Hansen, Holt, Brown, and Lopez pray for relief as follows:

A.   Judgment against Defendant for violation of the overtime provisions of the FLSA;

B.   Judgment against Defendant for violation of the minimum wage provisions of the FLSA;

C.   Judgment that Defendant's violations were willful;

D.   An award in an amount equal to unpaid back wages due to Plaintiffs at the applicable overtime and minimum wage rates;

E.   An award to Plaintiffs for the amount of unpaid overtime and minimum wages owed, liquidated damages and penalties where provided by law, and interest thereon, subject to proof at trial;

F.   An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216 and/or other applicable laws;

49

G.  An award of prejudgment interest to the extent liquidated damages are not awarded;

H.  Leave to add additional plaintiffs by motion, the filing of written consent forms, or any other method approved by the Court; and

I.  For such other and further relief, in law or equity, as this Court may deem appropriate and just.

**WHEREFORE**, Plaintiff Graves additionally prays for relief as follows:

A. Judgment against Defendant for violation of the anti-retaliation protections in the FLSA;

B. Judgment against Defendant for loss of income, emotional distress, and other relief for retaliation;

C. Judgment that Defendant's violation was willful and/or not in good faith;

D. An award of any pre- and post-judgment interest;

E. An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216 and/or other applicable laws;

F. An award of punitive damages; and

G. Such further relief as may be appropriate.

## DEMAND FOR A JURY TRIAL

Plaintiffs, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, demand a trial by jury.

Dated: November 15, 2021

**AUSTIN & SPARKS, P.C.**
*/s/ John T. Sparks, Sr.*
John T. Sparks, Sr.
Georgia Bar No. 669575
2974 Lookout Place, N.E., Suite 200
Atlanta, Georgia 30305
404-869-0100 / 404-869-0200 (fax)
jsparks@austinsparks.com

**NICHOLS KASTER, PLLP**
Charles J. O'Meara
MN Bar No. 0402777*
4700 IDS Center, 80 South 8th Street
Minneapolis, MN 55402
612-256-3200 / 612-215-6870 (fax)
comeara@nka.com

**NICHOLS KASTER, LLP**
Matthew C. Helland
CA Bar No. 250451*
235 Montgomery St., Suite 810
San Francisco, CA 94104
415-277-7235 / 415-277-7238 (fax)
helland@nka.com

**JUSTICE CATALYST LAW**
Lucy B. Bansal
D.C. Bar No. MD06639*
Janet Herold
CA Bar No. 632479*
123 William Street, 16th Floor
New York, NY 10038
Tel: 518-732-6703
lbansal@justicecatalyst.org
jherold@justicecatalyst.org

**ATTORNEYS FOR THE PLAINTIFFS**

*pro hac vice applications forthcoming*

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing document has been prepared in accordance with the font and point requirements of Local Rule 5.1(C) of the United States District Court for the Northern District of Georgia, using 14 point Times New Roman font, as approved by the Court.

Date:  November 15, 2021.

> **AUSTIN & SPARKS, P.C.**
> */s/ John T. Sparks, Sr.*
> John T. Sparks, Sr.
> Georgia Bar No. 669575
> 2974 Lookout Place, N.E., Suite 200
> Atlanta, Georgia 30305
> 404-869-0100 / 404-869-0200 (fax)
> jsparks@austinsparks.com
>
> Counsel for Plaintiffs